# EXHIBIT 2

# LORIA PHARMACEUTICAL

*LICENSEE AGREEMENT **NOTICE***

**Loria Pharmaceutical LLC**
10773 NW 58th St Ste 751
Doral FL 33178

1-844 – Dr Loria
786-409-5911
Info@LoriaPharmaceutical.com

## RE:  **LICENSEE AGREEMENT NOTICE**

Dear Licensees,

### INTRODUCTION:

Loria Pharmaceutical continues to rapidly grow the organization and the market for male enhancement.  To that end, we continue to assemble, implement and retain key business components to support our licensees.

In the short timeframe in which Loria Pharmaceutical has operated, we have continued to listen and adapt the business model to best support our licensees.  In a few short months, we have generated significant interest in the male enhancement market, Loria Technologies, and the desire to acquire and hold territories.

A primary objective has been to provide qualified physicians an opportunity to build a significantly profitable male enhancement practice in a protected territory.  As such, we have quickly realized that territory protection and management is a cornerstone of the business model.

Accordingly, the purpose of this notice is to:

1.      Provide an update on our progress;
2.      Inform you of the restructuring of the Loria Pharmaceutical contract; and
3.      Provide a method for you to secure a territory.

### BACKGROUND AND STATUS:

Some of you have a history of operating under the prior entity, Lorstan Pharmaceutical ("Lorstan").  As you know, Lorstan has been replaced with Loria Pharmaceutical.

Others of you have no history with Lorstan and have only dealt with Loria Pharmaceutical.

Currently, some of you have executed the earlier-provided agreement; others of you are reviewing the agreement.  Most if not all of you have been trained.

Meanwhile, we have trained twenty (20) physicians; we have ten (10) physicians on schedule to be trained; we have built out eight (8) labs in eight (8) states (CA, CO, FL, GA, NY, OK, TX, UT); and we

are planning lab buildout in at least ten (10) more states this year (ID, IL, MA, MI, MN, MO, OH, PA, TN, WA).

As such, in a short timeframe we have recognized that (1) to obtain our goal of protecting your territories we must immediately implement some control, and (2) we need to structure our relationship in a manner to adapt to change and unique requirements across territories.

## TERRITORY MANAGEMENT:

The first item we are addressing is that of territory management. Effective immediately, we will first be segmenting territories into specific metro population areas by population. We initially estimate that one physician can effectively service a population of one million. This estimate may be adjusted to as low as 500,000 population, depending on other factors. As such, we believe a location such as Chicago with nine million population will support nine to eighteen territories.

However, this one million segmentation is not a hard and fast rule. We also recognize that some territories will have higher demand than others due to socio-economic factors, demographic factors, etc. Accordingly, territories may need to be redefined in the future.

We recognize that, if you have secured a territory, you may not welcome additional physicians in your territory. Therefore, we offer two assurances to you in this regard: (1) we will not redefine a territory unless we are certain that the demand is not adequately being serviced in that territory; and (2) if we do redefine a territory, you will receive a first right of refusal to add a physician to your practice as a sub-licensee.

Lastly, regarding territories, we already have multiple physicians requesting overlapping territories. As such, we are immediately implementing a territory security program described below.

## RELATIONSHIP MANAGEMENT:

The second item we are addressing is relationship management. Up to now, the relationship between a licensee and Loria Pharmaceutical has been defined by the licensee agreement. We have learned that, as we grow, certain operational aspects of the relationship will need to adapt, and repeatedly changing the agreement to administer these relationship changes is a cumbersome and inefficient method that is burdensome for us and intrusive for you.

Accordingly, we have redrafted the core agreement in a form that we anticipate will not change for some time. The agreement will incorporate certain operational "policies" that will be made available to you online.

As example, if we wish to offer a price reduction for end of year orders, doing so would necessarily require us to modify our agreement because pricing is included in the agreement. Under the new method, pricing and promotional offers will be implemented via a policy. You will be notified when a policy changes or is added.

## TERRITORY SECURITY:

Currently, we face an issue where we have multiple physicians wanting overlapping territories, and some wanting geographies that are comprised of many millions of people. We also recognize some of you are still unsure if you want to become a licensee.

We realize some of you are interested but not yet ready for whatever reason; some of you are tire-kickers; and some of you are seriously interested. For those of you seriously interested, our objective is to give you security and dedicate our resources to helping you get started. For the others, we hope you will decide to join the Loria Enterprise, but we're sorry we can't wait and hold territories in the interim.

Our solution is to provide security for territories on a first come first served basis. If you desire a specific territory, you will be required to make payment to hold that territory for 60-days, at which time the payment will be credited to your first order. The 60-day period will provide you time to execute the agreement, retro-fit your procedure room, begin marketing, and be trained.

As additional incentive, we will provide to you a credit on your first order in the amount that you purchase equipment for your retro-fit room from Loria Products.

## FORMER LORSTAN LICENSEES:

For those of you currently operating under the former Lorstan licensee agreement, please recognize that organization is now defunct, and that agreement will be terminated. Pursuant to the Lorstan agreement, this correspondence serves as the thirty-day notice period require for termination.

Going forward, we hope you will appreciate that the Lortan model was in many ways inadequate and that our aim is to fix the many problems associated with it and set up a formal, responsive business operation.

## OUR OBJECTIVES:

1. Create a closed network of Loria Pharmaceutical physicians offering male enhancement; and
2. Offer our closed-network of physicians a unique opportunity to build a cash-based, non-insurance, practice with the realistic potential to generate seven-figure annual incomes.

## CONCLUSION:

Enclosed with this correspondence are the following to sign and execute:

1. **Independent Licensee and Services Agreement** *revised*
2. **Licensee Territory Exhibit A**
3. **Temporary Territory Security Agreement**.
4. **Review Policies**: A Link to all Policies associated with Pharmaceutical License Agreement: **www.loriapharmaceutical.com/policies** (password is POLICY2021)

# LORIA PHARMACEUTICAL

*INDEPENDENT LICENSEE AND SERVICE*
*AGREEMENT*

**Loria Pharmaceutical LLC**
10773 NW 58th St Ste 751
Doral FL 33178

1-844 – Dr Loria
786-409-5911
Info@LoriaPharmaceutical.com

## LORIA PHARMACEUTICAL

## INDEPENDENT LICENSEE AND SERVICE AGREEMENT

V1.1

## TABLE OF CONTENTS

Page

ARTICLE I Preamble ........................................................................................................................1

    1.1    Recitals ..........................................................................................................................1

ARTICLE II Definitions ...................................................................................................................2

    2.1    "Affiliate" .......................................................................................................................2
    2.2    "Certified Training" .......................................................................................................3
    2.3    "Confidential Information" .............................................................................................3
    2.4    "IP Dose" .......................................................................................................................3
    2.5    "Facility or "Facilities" .................................................................................................3
    2.6    "Laboratory" ..................................................................................................................3
    2.7    "Licensed Methods" ......................................................................................................3
    2.8    "Licensed Patent" ..........................................................................................................3
    2.9    "Licensed Products" ......................................................................................................3
    2.10   "Licensed Use" .............................................................................................................4
    2.11   "Monthly Report" .........................................................................................................4
    2.12   "Patient Data" ...............................................................................................................4
    2.13   "Person" ........................................................................................................................4
    2.14   "Pricing Controls" ........................................................................................................4
    2.15   "Policies" or "Policy" ...................................................................................................4
    2.16   "Retro-Fit Room" .........................................................................................................4
    2.17   "Royalty" ......................................................................................................................4
    2.18   "Shadowing" .................................................................................................................4
    2.19   "Sub-Licensee" .............................................................................................................5
    2.20   "Technician" .................................................................................................................5
    2.21   "Term" ..........................................................................................................................5
    2.22   "Territory" ....................................................................................................................5
    2.23   "Trade Secret" ..............................................................................................................5

ARTICLE III Grant of Rights ...........................................................................................................5

    3.1    Grant of License ............................................................................................................5
    3.2    License Territory ...........................................................................................................5
    3.3    License Limitation ........................................................................................................6
    3.4    Licensed Intellectual Property ......................................................................................6
    3.5    License is Personal .......................................................................................................6
    3.6    Licensee Sub-Contracting to Sub-Licensees ...............................................................6

ARTICLE IV Royalties and Compensation ......................................................................................6

    4.1    Royalties and Payments ................................................................................................6
    4.2    Payments and Reporting ...............................................................................................6
    4.3    Recordkeeping ..............................................................................................................7
    4.4    Continuing Right ..........................................................................................................7

| 4.5 | Patient Privacy | 7 |
| 4.6 | Education and Support Materials | 7 |
| 4.7 | Payments Made to Licensor | 7 |

ARTICLE V Quality Standards and Quality Control ........................................................ 8

| 5.1 | Technician Supervision | 8 |
| 5.2 | Licensee's Certification Information | 8 |
| 5.3 | Compounding Records | 8 |
| 5.4 | Standards | 8 |
| 5.5 | Retro-Fit Room Construction | 8 |
| 5.6 | Retro-Fit Room Cleaning | 9 |
| 5.7 | Retro-Fit Room Survey | 9 |
| 5.8 | Retro-Fit Room Maintenance | 9 |
| 5.9 | Patient Forms | 9 |
| 5.10 | Communications Methods | 9 |
| 5.11 | Testimonials | 9 |
| 5.12 | Initial Training | 9 |
| 5.13 | Maintain Competency | 9 |

ARTICLE VI Confidential Information and Trade Secrets ................................................ 10

| 6.1 | Obligations of Confidentiality | 10 |
| 6.2 | Duration of Confidentiality | 10 |
| 6.3 | Limitations on Confidentiality | 10 |
| 6.4 | Proprietary Rights and Confidential Non-Disclosure Agreement | 10 |

ARTICLE VII The Licensed Patent ................................................................................. 11

| 7.1 | Protection and Defense of Patent | 11 |
| 7.2 | Licensor Not Obligated | 11 |
| 7.3 | No Licensee Challenge | 11 |
| 7.4 | Costs and Fees of Challenge | 12 |

ARTICLE VIII Non-Compete and Non-Solicitation ......................................................... 12

| 8.1 | Non-Competition and Non-Solicitation | 12 |
| 8.2 | Competitive Business | 12 |
| 8.3 | Reasonableness and Irreparable Injury | 12 |
| 8.4 | Severability | 13 |

ARTICLE IX Work Product ............................................................................................. 13

| 9.1 | Ownership of Work Product | 13 |

ARTICLE X Representations, Warranties, and Disclaimers .............................................. 14

| 10.1 | Mutual Representations and Warranties | 14 |
| 10.2 | Licensee's Representations and Warranties | 14 |
| 10.3 | Marketing Representations | 15 |
| 10.4 | Disclaimer of Representations and Warranties | 16 |

ARTICLE XI Indemnification, Insurance and Limitation of Liability............................................16

11.1   Indemnification .....................................................................................................16
11.2   Procedures..............................................................................................................16
11.3   Insurance ...............................................................................................................17
11.4   Limitation of Liability...........................................................................................17

ARTICLE XII Termination ..........................................................................................................17

12.1   Grounds for Termination .......................................................................................17
12.2   Effects of Termination ...........................................................................................18
12.3   Term and Auto Renewal ........................................................................................18

ARTICLE XIII Lab Use Agreement.............................................................................................18

13.1   Licensee Use of Laboratory ...................................................................................18
13.2   Licensee Use of Technician ...................................................................................18
13.3   Compensation for Lab Use and Technician ............................................................19
13.4   Licensee Access to Laboratory ..............................................................................19
13.5   Delays....................................................................................................................19
13.6   Risk .......................................................................................................................19
13.7   Assumption of Risk................................................................................................19
13.8   Exemption from Liability.......................................................................................20
13.9   Practice of Medicine ..............................................................................................20
13.10  Covenant Not to Sue .............................................................................................20
13.11  Continuation of Obligations...................................................................................20

ARTICLE XIV Miscellaneous .....................................................................................................20

14.1   Entire Agreement ..................................................................................................20
14.2   Modification of Agreement.....................................................................................20
14.3   Modification by Policy...........................................................................................21
14.4   Consideration for Agreement Modifications ...........................................................21
14.5   Assignment............................................................................................................21
14.6   Licensee Rights are Personal .................................................................................21
14.7   Waiver....................................................................................................................21
14.8   Relationship of Parties ..........................................................................................21
14.9   Severability ...........................................................................................................22
14.10  Notices ..................................................................................................................22
14.11  Patent Numbers .....................................................................................................22
14.12  Governing Law, Venue and Jurisdiction.................................................................22
14.13  Survival .................................................................................................................22

## INDEPENDENT LICENSEE AND SERVICE AGREEMENT

**THIS INDEPENDENT LICENSE AND SERVICE AGREEMENT** (the "Agreement" or the "License") is made and entered into as of the _22_ day of _Apr_ , _2021_ (the "Effective Date") by and between:

1. _Dr. Walter Kane + Dr. Matthew Sam_ ("Licensee"), a medical practice or independent physician having an office at the address set forth on the signature page of this Agreement (Licensee may be a professional corporate entity owned and controlled by a duly licensed physician);

2. ***Loria Pharmaceutical, LLC*** ("Licensor"), a limited liability company organized in the State of Florida having an office at 10773 N.W. 58th St., Ste. 751, Doral, Florida 33178;

3. ***Loria Management, LLC*** ("Loria Management"), a limited liability company organized in the State of Florida having an office at 10773 N.W. 58th St., Ste. 751, Doral, Florida 33178;

4. ***Loria Compounding Consultants and Staffing Services, LLC*** ("LCCSS"), a limited liability company organized in the State of Florida having an office at 10773 N.W. 58th St., Ste. 751, Doral, Florida 33178; and

5. ***Loria Products, LLC*** ("Loria Products"), a limited liability company organized in the State of Florida having an office at 10773 N.W. 58th St., Ste. 751, Doral, Florida 33178.

The above listed parties may be referred to herein as a "Party" or, collectively, as "Parties."

### ARTICLE I
### PREAMBLE

1.1   Recitals.

**WHEREAS**, Loria Pharmaceutical, LLC ("Licensor"), Loria Management, LLC, Loria Compounding Consultations and Staffing Services ("LCCSS"), and Loria Products, LLC, are entities controlled by Dr. Victor Loria, the inventor of various intellectual property (collectively, "Loria Enterprise");

**WHEREAS**, the Loria Enterprise is operated to promote and support the use of the various intellectual property;

**WHEREAS**, the Loria Enterprise has various proprietary and confidential information and intellectual property relating to a silicone based injectable filler composition and cosmetic enhancement methods using same (hereinafter "Injectable Technology"), and has the

right to produce the product of the Licensed Patent (as defined herein), and of the inventions and improvements and improvement thereof disclosed therein (hereinafter "the Invention");

**WHEREAS**, Licensee desires to obtain, and Licensor desire to provide, only a license to Licensor's intellectual property for the purpose of Licensee's and all Sub-Licensees' compounding and using the Injectable Technology, but expressly not the specific goods and ingredients composing the Injectable Technology;

**WHEREAS**, Licensor possesses technical information and expertise in the use of the Invention and in the Injectable Technology;

**WHEREAS**, Licensee and all Sub-Licensees desire to be trained to use, or is already trained to use, the Invention and the Injectable Technology and to make and use the Invention and the Injectable Technology;

**WHEREAS**, the Loria Enterprise seeks to strictly control the use of the Invention and the Injectable Technology, including strict quality control of all aspects of its use;

**WHEREAS**, Licensee and all Sub-Licensees seek to consent to all Loria Enterprise activities and actions necessary to implement strict quality control of all aspects of Licensee's and all Sub-Licensees' use of the Invention and Injectable Technology;

**WHEREAS**, Licensee or ant Sub-Licensee may or may not have been a party to one or more agreements with Lorstan Pharmaceutical, LLC, and related entities, including a License Agreement, a Release Agreement, a Proprietary Rights and Confidential Non-Disclosure Agreement, and/or a Sterile Laboratory Use Agreement ("Prior Agreements"), all of which are intended to be fully superseded, replaced and merged into this Agreement;

**WHEREAS**, Licensor and Licensee and all Sub-Licensees intend this Agreement to fully and completely supersede any and all Prior Agreements, whether written or oral; and

**WHEREAS**, Licensor and Licensee intend the terms and conditions of this Agreement to fully extend to, be applicable to, and to bind all Sub-Licensees, to the extent that Licensor becomes and is a third-party beneficiary of such terms and conditions with regards to all Sub-Licensees.

**NOW, THEREFORE**, in consideration of the promises and mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE II
## DEFINITIONS

2.1     "Affiliate" means a Person that controls, is controlled by or is under common control with a Party, but only for so long as such control exists.

2.2    "Certified Training" means the educational process and protocol prescribed and required by Licensor for a Licensee to become eligible to perform the Licensed Use of the Licensed Products on patients. The Licensee's cost of Certified Training is as set forth in Policy.

2.3    "Confidential Information" means any confidential or proprietary data or information with respect to Licensor, other than Trade Secrets (as defined hereafter), that is valuable to Licensor and not generally known to the public or to competitors of Licensor including: (i) information relating to the business, operations or products of Licensor or any of its Affiliates, including any know-how, that Licensor discloses or makes available to Licensee under this Agreement, or otherwise becomes known to the Licensee by virtue of this Agreement, and (ii) the terms of this Agreement; provided that Confidential Information shall not include information that:

(a)    is or becomes generally available to the public other than as a result of disclosure by the Licensee;

(b)    is already known by or in the possession of Licensee at the time of disclosure by Licensor;

(c)    is independently developed by Licensee without use of or reference to Licensor's Confidential Information; or

(d)    is obtained by Licensee from a Third Party that has not breached any obligations of confidentiality.

2.4    "IP Dose" means the number of cubic centimeters ("cc") representing a single patient dosage amount of the Injectable Technology compounded by the Licensee under the intellectual property rights granted to Licensee hereunder. The number of cc's in a single IP Dose is determined by the Licensor, is subject to change upon notice by Licensor in Licensor's sole discretion, and is set forth in Policy.

2.5    "Facility or "Facilities" means the physical room/location the Licensee performs the Licensed Use of the Licensed Products on patients, including all storage locations within Licensee's premises for the Licensed Products and other materials associated with the Licensed Use.

2.6    "Laboratory" means the facility in which the Licensed Products are compounded by use of the Licensed Methods.

2.7    "Licensed Methods" means methods according to the Licensed Patent and/or the Injectable Technology.

2.8    "Licensed Patent" means U.S. Patent No. 9,993,578, and any reexaminations or reissues thereof.

2.9    "Licensed Products" means compositions according to the Licensed Patent and/or making use of the Injectable Technology.

2.10    "Licensed Use" means: (i) the compounding of the Licensed Products for the exclusive use of Licensee, (ii) the use by Licensee of the Licensed Products exclusively for soft tissue augmentation in a patient, and (iii) the use of the Licensed Methods exclusively for soft tissue augmentation in a patient.

2.11    "Monthly Report" means the required Licensee monthly report provided to Licensor detailing for the applicable month of the number of patients receiving the Licensed Products via a procedure performed by Licensee.

2.12    "Patient Data" means the Licensor-prescribed data set to be provided by Licensee to Licensor regarding each individual patient receiving the Licensed Products via a procedure performed by Licensee.

2.13    "Person" means and includes any natural person, corporation, firm, joint venture, partnership, limited liability company, trust, unincorporated organization, government or any department, political subdivision or agency of a government.

2.14    "Pricing Controls" means the Licensor-specified retail price promoted and collected for the Licensed Use of the Licensed Products on patients. Licensor's initial Pricing Controls are as set forth in Policy.

2.15    "Policies" or "Policy" means Licensor's operational policies and procedures relating to the operational aspects of the business arrangement contemplated by this Agreement. Licensor's published Policies (i) are incorporated into this Agreement upon the terms and effective dates as may be specified in each such Policy; (ii) shall be made available to Licensee via a Licensor-specified online location secure access method; and (iii) shall be considered Confidential.

2.16    "Retro-Fit Room" means the process of adapting a room within Licensee's business premises to meet Licensor's required standards for the Licensee to perform the Licensed Use of the Licensed Products on patients. The cost of a Retro-Fit Room shall be the obligation of the Licensee and may vary depending on various factors including the amount of work and equipment necessary to meet Licensor's required standards.

2.17    "Royalty" means the amount of money (in US dollars) per cubic centimeter ("cc") of Licensed Product compounded regardless of its ultimate disposition; provided, Licensor may increase or decrease the Royalty amount with no less than thirty (30) day's written notice to the Licensee, and/or may implement a Royalty schedule of pricing based on Licensee's volume purchases. The initial Royalty amount is as set forth in Policy, which is hereby incorporated into this Agreement.

2.18    "Shadowing" means the process by which a trained medical assistant of the Loria Enterprise may be made available to the Licensee during the first ninety (90) days of the Licensee's performing the Licensed Use of the Licensed Products on patients. The medical assistance shall be available to observe and assist with Licensee's responses to Licensee's patients, and License shall allow the medical assistance full and unfettered access to all information, records, and patient communications necessary to perform Shadowing, including direct communication with patients. If made available to Licensee, the cost to Licensee, if any, shall be as set forth in Policy.

2.19 "Sub-Licensee" means a physician duly qualified and credentialed as required to become a Licensee hereunder, working for or on behalf the Licensee and performing the Licensed Use of the Licensed Products on patients under an agreement with Licensee, regardless of form of the agreement including but not limited to an independent contractor, employee, or practice partner.

2.20 "Technician" means an individual technician that is appropriately trained, skilled, qualified, and approved by Licensor in accordance with the Licensor's approval process to use the Laboratory for compounding of the Licensed Product.

2.21 "Term" means a twelve-month period commencing on the Effective Date of this Agreement unless this Agreement is terminated earlier in accordance with Article 12 herein. The Term of this his Agreement shall automatically renew unless otherwise terminated as set forth in Article 12 herein.

2.22 "Territory" means the area defined by the Licensor in which the Licensee will operate and from which the Licensee and Licensor intend to regard as the area from which prospective patients residing therein will be directed by Licensor to Licensee. A Territory may be redefined by Licensor in Licensor's sole discretion upon thirty (30) days written notice to Licensee with notice as set forth in Section 3.2. Territory assignments to Licensees may be initially assigned and based on greater metropolitan populations of approximately 500,000 to 1,000,000 and other factors (e.g., geography, population density, demographics, socio-economics, and other factors as applicable in Licensor's sole discretion). Licensor's list of United States Territories is as set forth in Policy. The initial Territory for Licensee shall be as set forth in Exhibit A.

2.23 "Trade Secret" means confidential or proprietary information with respect to the conduct or details of Licensor including, but not limited to, any technical or nontechnical data, formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, financial plan, product plan, list of actual or potential customers or suppliers or other information similar to any of the foregoing, which (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can derive economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy as set forth in the Uniform Trade Secrets Act or as set forth under the common law of the State of Florida.

## ARTICLE III
## GRANT OF RIGHTS

3.1 Grant of License. Licensor hereby grants to Licensee, and Licensee hereby accepts upon the terms and conditions set forth in this Agreement, a limited, nontransferable license, non-sublicensable, and non-exclusive right to practice the Licensed Use in the Territory during the Term.

3.2 License Territory. Upon thirty (30) days' written notice from Licensor, the Territory associated with Licensee's right to practice the Licensed Use may be changed to allow another licensee(s) within Licensee's Territory, or Licensor may change Licensee's geographic Territory. Licensor's decision to make any such change to Licensee's Territory will be based only

upon Licensor's reasonable commercial belief that additional licensees are necessary to sufficiently and efficiently satisfy the demand for male enhancement services within the Territory. Licensor agrees that prior to any additional licensee being granted such rights which overlap Licensee's Territory or any change to Licensee's geographic Territory, Licensee shall have first right of refusal to add resources to Licensee's independent practice to address Licensor's belief that additional licensees are necessary to sufficiently and efficiently satisfy the demand for male enhancement services within the Territory.

3.3     License Limitation. It is understood and agreed that this license shall pertain only to the Licensed Use and does not extend to any other use of the Licensed Products or the Licensed Methods.

3.4     Licensed Intellectual Property. It is further understood and agreed that the Licensee is licensing, and Licensor is providing a license to, only intellectual property rights and not the specific goods and ingredients associated with the Injectable Technology.

3.5     License is Personal. Licensee's rights granted hereunder are personal to Licensee and shall not extend to other physicians or others associated with Licensee, including Sub-Licensees, unless otherwise approved in writing by Licensor.

3.6     Licensee Sub-Contracting to Sub-Licensees. With Licensor's express written approval and consent, Licensee may employee or otherwise contract with Sub-Licensees in Licensee's Territory provided each Sub-Licensee is a duly qualified physician and will work under Licensee's license and in Licensee's Territory. Licensee agrees that all such Sub-Licensee's will be subject to the terms and conditions of this Agreement and that any breach of this Agreement by a Sub-Licensee shall inure to and be the full and complete responsibility of the Licensee. Licensee further agrees that, if Licensee enters into any agreement or relationship with any Sub-Licensee, Licensee will provide all Sub-Licensees a copy of this Agreement or otherwise ensure and attest that each Sub-Licensee has been fully informed of the terms and conditions of this Agreement that that such terms and conditions are applicable to and bunding upon each Sub-Licensee.

## ARTICLE IV
## ROYALTIES AND COMPENSATION

4.1     Royalties and Payments. In consideration of the rights granted by Licensor herein, Licensee hereby irrevocably agrees to pay Licensor, in accordance with this Article, all Royalties accrued both during and after the Term from any source. All Royalties due hereunder shall be paid to Licensor in United States dollars without deductions of any kind.

4.2     Payments and Reporting. Upon compounding of the Licensed Products for Licensee and/or all Sub-Licensee, Licensee shall remit to Licensor full payment of all Royalties due and owing under this Agreement to Licensor. In addition, monthly, Licensee shall deliver to Licensor for Licensee and all Sub-Licensee: (i) a Monthly Report detailing for the applicable month of the number of patients receiving the Licensed Products via a procedure performed by Licensee and all Sub-Licensees; and (ii) a report of the Patient Data containing a detailed data set (specified by Licensor) representing specific individual data acquired from each patient receiving the Licensed Products via a procedure performed by Licensee and all Sub-Licensees.

-6-

4.3     Recordkeeping. Licensee shall keep, maintain and preserve in Licensee's principal place of business, during the Term and for two (2) years following the final expiration or termination of this Agreement, for Licensee and all Sub-Licensees, complete and accurate books, records and accounts covering all transactions relating to this Agreement, including, without limitation, invoices, correspondence, banking, financial, internal accounting and accounting work papers, and all other pertinent records and accounts relating to the computation or accounting of Royalties (the "Records"). The Records shall be available upon Ten (10) business days' prior notice for inspection and audit at Licensor's sole cost and expense by Licensor or its nominee(s) at any time or times during the Term and for two (2) years thereafter, during reasonable business hours and without undue disruption of Licensee's normal business operations. Licensor's rights shall include examination, copying and making extracts of the Records. Licensee agrees to cooperate with Licensor or Licensor's nominee(s) in the performance of all inspections and audits. Any error or discrepancy discovered in the Records or statements or short-fall or excess in payments made in connection therewith shall immediately be rectified and the appropriate payments made by Licensee to Licensor in the case of a short-fall in payments or to Licensor in the case of an overpayment, together with interest at the then current JPMorgan Chase Bank, N.A. prime rate per annum from the date(s) proper payments were originally due.

4.4     Continuing Right. Receipt or acceptance by Licensor or its nominee(s) of any of the statements furnished pursuant to this Agreement, the exercise by Licensor in whole or in part at any time or times of the right to audit and inspect the Records, or the receipt or deposit by Licensor or its nominee(s) of any payment tendered by or on behalf of Licensee and all Sub-Licensees shall be without prejudice to any rights or remedies of Licensor and shall not prevent Licensor from thereafter disputing, within the applicable time period, the accuracy of any such statements, payments, or the Records.

4.5     Patient Privacy. Any Licensor request for Licensee records or audit of Licensee's practice information, including all Sub-Licensees, shall be subject to all state and federal laws regarding patient health information privacy (e.g., HIPAA), and shall be limited in scope to information related to the performance of this Agreement.  With regards to patients' protected health information, the Parties agree that the Business Associate Agreement set forth in Policy is hereby incorporated into this Agreement.

4.6     Education and Support Materials. Licensor may make available to Licensee and all Sub-Licensees certain information, videos, and other educational and support materials, which may be updated from time to time by Licensor.  Costs of such education and support materials, if any, shall be paid by Licensee as set forth in Policy.

4.7     Payments Made to Licensor. All payments made by Licensee under this Agreement, including payments made by Licensee for all Sub-Licensees:

(a)     Shall be to the payee as set forth on Policy unless otherwise agreed by Licensor;

(b)     Are due and payable in full as set forth in Policy unless otherwise agreed by Licensor.

-7-

## ARTICLE V
## QUALITY STANDARDS AND QUALITY CONTROL

5.1     Technician Supervision.   Licensee shall be solely responsible for hiring or contracting with a LCCSS Technician (defined below) trained and approved by Licensor to compound the Licensed Products exclusively for the Licensed Use by Licensee in strict compliance with all applicable laws and regulations, including but not limited to Section 503A of the Federal Food, Drug, and Cosmetic Act. Ingredients used in the compounding of the Licensed Products shall be exclusively obtained from Licensor and/or acquired from other sources or suppliers authorized by Licensor, and shall be used by Licensee only for compounding the Licensed Products.

5.2     Licensee's Certification Information.   Licensee agrees to provide to Licensor or its designee all of Licensee certification information (e.g., DEA number) and authority to order ingredients on Licensee's behalf, the cost of all such ingredients to be Licensee's responsibility. Licensee will additionally execute any additional documents or agreements if requested and necessary for ordering of specified ingredients.   Licensor will keep and maintain all such information as confidential.  When contracted by Licensee, the LCCS-supplied Technician shall be fully and completely under the Licensee's supervision pursuant to all applicable state and/or federal law.

5.3     Compounding Records.   Licensee shall maintain all records of compounding Licensed Products provided to Licensee by the LCCSS Technician (defined below).

5.4     Standards.   Licensee shall, for Licensee and all Sub-Licensees, insure at all times that the Licensed Products and all materials, equipment, literature and Facilities associated therewith meet Licensor's reasonable and material standards of quality and Licensee shall cooperate fully in all reasonable ways with Licensor in enabling Licensor to ascertain that all Licensed Products and all materials, equipment, literature and Facilities associated therewith meet said standards. By way of example rather than limitation, Licensee, on behalf of Licensee and all Sub-Licensees, shall:

(a)     Upon reasonable notice of Licensor and provision of reasonable liability waivers, allow Licensor, during regular business hours, to inspect any production Facility where any Licensed Product is being produced or premised wherein any Licensed Product is being stored to determine whether Licensee is adhering to the requirements of this Agreement and all Licensor's standards relating to the nature and quality of the Licensed Products and the use of the Licensed Patent and Licensor's rights in connection therewith. It is Licensee's sole and complete responsibility to ensure that all products are produced in accordance with the terms hereof.

(b)     Upon request of Licensor and at Licensor's sole expense, send to Licensor reasonable quantities of representative samples of Licensed Products for the purposes of testing, inspection, and review.

5.5     Retro-Fit Room Construction.   Licensee, for Licensee and all Sub-Licensees, shall construct or otherwise configure one or more Retro-Fit Rooms in which Licensee and/or Sub-Licensees will perform the Licensed Use of the Licensed Products.  Licensee hereby attests that

the Retro-Fit Room will be constructed or otherwise configured to Licensor's specifications in all respects.

      5.6    Retro-Fit Room Cleaning.  Licensee shall regularly and routinely clean the Retro-Fit Room in a manner and on a schedule as recommended by Licensor.

      5.7    Retro-Fit Room Survey.  If requested by Licensor, Licensee shall allow Licensor to survey the Retro-Fit Room(s) upon reasonable notice during normal business hours, including any cleaning logs Licensee maintains.

      5.8    Retro-Fit Room Maintenance.  Licensee's or any Sub-Licensee's failure to meet Licensor's standards for the Retro-Fit Room shall be considered a material breach of this Agreement and grounds for immediate termination.

      5.9    Patient Forms.  Licensee and all Sub-Licensees agree to use patient forms provided by Licensor for all patient intake and authorizations (or language or forms substantially the same as approved by Licensor).

      5.10   Communications Methods.  Licensee and all Sub-Licensees agree to the use of email and cellular text message methods of communication to Licensee or Sub-Licensee, including such methods for communication from Licensor, its affiliates, staff, and agents, and to Licensee's affiliates, staff, and agents.

      5.11   Testimonials.  Licensee and all Sub-Licensees agree to cooperate with Licensor in any of Licensor's efforts to obtain Licensee's patients' videos, testimonials, or other endorsements for use in Licensor's marketing efforts. If Licensor elects to utilize any such materials in Licensor's marketing efforts, Licensor agrees to publish recognition to Licensee for such materials.

      5.12   Initial Training.  Unless waived by Licensor, Licensee and all Sub-Licensees shall schedule and attend one or more training sessions to be conducted by Licensor or its designee, and shall not perform the Licensed Use of the Licensed Products on patients or any other individual unless and until such Licensee or Sub-Licensee has received affirmative authorization from Licensor of Licensee or Sub-Licensee acquiring sufficient skills, training and experience to perform the Licensed Use of the Licensed Products on patients.  Licensee shall pay to Licensor for training in the amount and under the terms as set forth in Policy.

      5.13   Maintain Competency.  Upon request by Licensor, Licensee and all Sub-Licensees shall schedule and attend training with Licensor or its designee or otherwise demonstrate to Licensor's satisfaction that Licensee and all Sub-Licensees continue to maintain sufficient skills, training and experience necessary to perform the Licensed Use of the Licensed Products on patients.  Licensee shall be responsible for Licensee's and all Sub-Licensee's required travel for any such training. Licensor shall not require Licensee or any Sub-Licensee to demonstrate competency or train more than once in any 24-month period unless Licensor has credible evidence that Licensor's quality control may be jeopardized without such demonstration.  Licensee shall pay to Licensor for such ongoing training in the amount and under the terms as set forth in Policy.

## ARTICLE VI
## CONFIDENTIAL INFORMATION AND TRADE SECRETS

6.1     Obligations of Confidentiality.  Licensee and all Sub-Licensees acknowledge in the course of its relationship with Licensor as a licensee, it has received or will receive and has had or will have access to Confidential Information and Trade Secrets of Licensor, and including but not limited to this Agreement, confidential and secret business and marketing plans, strategies and studies, detailed client/customer lists and information relating to the operations and business requirements of those clients/customers and, accordingly, Licensee and all Sub-Licensees are willing to enter into the covenants contained in this Article VI in order to provide Licensor with what Licensee and all Sub-Licensees consider to be reasonable protection for Licensor's interests.

6.2     Duration of Confidentiality.  Licensee and all Sub-Licensees hereby agree that, during the Term of this Agreement and for a period of two (2) years thereafter, it will hold in confidence all Confidential Information of Licensor that came into its knowledge during the Term and will not disclose, publish or make use of such Confidential Information without the prior written consent of Licensor. Licensee and all Sub-Licensees shall hold in confidence all Trade Secrets of Licensor that came into its knowledge during the Term and shall not disclose, publish or make use of at any time after the date hereof such Trade Secrets without the prior written consent of Licensor for as long as the information remains a Trade Secret, and with regard to patents(s) or intellectual property(s), coterminous with the lawful privacy protection accompanying such Licensed Patent or intellectual property.

6.3     Limitations on Confidentiality.  Notwithstanding the foregoing, the provisions of this Article VI will not apply to information required to be disclosed by Licensee or any Sub-Licensee by court order or applicable law. Moreover, the parties agree that the restrictions stated in this Article VI are in addition to and not in lieu of protections afforded to trade secrets and confidential information under applicable state and/or federal law. Nothing in this Agreement is intended to or shall be interpreted as diminishing or otherwise limiting the Licensor's right under applicable state and/or federal law to protect its Trade Secrets and Confidential Information.

6.4     Proprietary Rights and Confidential Non-Disclosure Agreement.

(a)     Licensee and all Sub-Licensees agree and understand that Licensor will disclose proprietary and confidential information to Licensee and Sub-Licensee(s). Licensee and all Sub-Licensees recognize and acknowledge the proprietary rights of Licensor in and to the information and the valuable and confidential nature of the information and agrees to accept and maintain on a confidential basis all the information disclosed to Licensee and all Sub-Licensees.

(b)     Licensee and all Sub-Licensees agree to protect and safeguard the information against unauthorized publication or disclosure, and particularly agrees: (a) not to use, directly or indirectly, any of the information for the benefit of Licensee or for the benefit of another, separate and apart from the purposes of this Agreement; (b) not to make, or have made, any device incorporating or using any elements, structure, assembly or function of the information; (c) not to promote, sell or manufacture using any device copied from or adapted from the information; (d) not to disclose, publish or reveal in any manner whatsoever, either directly or indirectly, any of the information; and (e) not to use any of the information in any way directly or

indirectly damaging to the proprietary, business or confidential interest of Licensor in the information.

(c)  All obligations of confidence, pursuant to and in accordance with the provisions of this Agreement shall terminate with respect to any particular portion of the information disclosed to Licensee and all Sub-Licensees which: (i) is or shall have been in the possession of Licensee or any Sub-Licensee prior to disclosure thereof by Licensor; (ii) is or through no fault of Licensee or any Sub-Licensee, becomes published or otherwise available to others or the public under circumstances such that others or the public may utilize the information without any direct or indirect obligation to Licensor; or (iii) is or at any time may be acquired by Licensee or any Sub-Licensee from any third party rightfully possessed of the information and having no direct or indirect obligation to Licensor with respect to same.

(d)  Further and without limitation on any particular obligation of confidence recited herein, Licensee and all Sub-Licensees shall not be permitted to justify disregarding the obligations of confidence of this Agreement by using the information of Licensor to guide a search for publications or other publicly available information, selecting individual pieces of information. and fitting them together by use of integrated disclosure to contend the information is in the public domain.

ARTICLE VII
THE LICENSED PATENT

7.1  Protection and Defense of Patent.  Licensee and all Sub-Licensees shall cooperate fully with Licensor, at Licensor's sole cost and expense, in the defense and protection of the Patent and shall promptly advise Licensor when Licensee or any Sub-Licensee has received written information or otherwise has actual knowledge of any potentially infringing use by any third party or any suit brought, or claim made, against Licensee or any Sub-Licensee involving the Licensed Patent. Licensee and all Sub-Licensees may not take any action with respect to defense and protection of the Patent or affecting the rights to the Licensed Patent without the prior written consent of Licensor.

7.2  Licensor Not Obligated.  Nothing in this Agreement will be construed as obligating Licensor to bring or prosecute actions or suits against any third party for patent, copyright, or trademark infringement.

7.3  No Licensee Challenge.  Licensee and its Affiliates and all Sub-Licensees will not, directly or indirectly (including where such is done by a third party on behalf of Licensee or its Affiliates or any Sub-Licensee, at the urging of Licensee or its Affiliates or any Sub-Licensee, or with the assistance of the Licensee or its Affiliates or any Sub-Licensee) challenge the validity, scope, or enforceability of or otherwise oppose any right of Licensor in the Licensed Patent (hereinafter "Licensor Patent Right"), provided that if any Licensor Patent Right is asserted against Licensee or its Affiliate(s) or any Sub-Licensee for activities authorized under this Agreement, then such Licensee or its Affiliate(s) or any Sub-Licensee is entitled to all and any defenses available to it including challenging the validity or enforceability of such Licensor Patent Right. Licensee and all Sub-Licensees will comply with all laws that apply to its activities or obligations under this Agreement.

7.4     Costs and Fees of Challenge.  Notwithstanding the requirement of Section 7.3, if Licensee or any Sub-Licensee does bring any such challenge and such a challenge is unsuccessful or otherwise fails or the matter is settled by mutual agreement of the Parties, Licensee shall pay all reasonable attorneys' fees incurred by the Licensor in opposing or otherwise responding to such a challenge.

## ARTICLE VIII
## NON-COMPETE AND NON-SOLICITATION

8.1     Non-Competition and Non-Solicitation.  During the Term of this Agreement and for a period of two (2) years thereafter, Licensee and all Sub-Licensees shall not, directly or indirectly, acting alone or in conjunction with others, anywhere in the United States:

(a)     be employed or otherwise engaged in any capacity, in any business in competition with Licensor relating to the Licensed Patent, the Licensed Products, the Licensed Methods or the Licensed Use;

(b)     request any parties working for or with Licensor to curtail or cancel their business with Licensor;

(c)     solicit, canvass or accept any business or transaction for any other person, firm or corporation or business in competition with Licensor and relating to the Licensed Patent, or the Injectable Technology; or

(d)     induce, or attempt to influence, any other person or entity rendering services to, or employee of, Licensor, to terminate their relationship or employment with Licensor or to enter into any employment or other business relationship with any other person (including Licensee), firm or corporation.

8.2     Competitive Business.    For purposes of this paragraph, a business in competition with Licensor shall include a business in which the use of permanent and non-permanent fillers including silicone oil-based and polymethyl methacrylate ("PMMA") medications and materials are used for male enhancement, but shall not include other male enhancement methods or materials such as fat or tissue grafting or implants.

8.3     Reasonableness and Irreparable Injury.  Licensee and all Sub-Licensees expressly acknowledge that:

(a)     Licensor's business is highly competitive and requires substantial and continuous expenditures of time and money to develop, market and maintain.

(b)     The restrictions contained in this Article VIII are narrow and reasonable in relation to the skills which represent Licensee's principal saleable asset both to the Licensor and to others.

(c)     The geographical scope of the provisions of this Article VIII is reasonable, legitimate and fair to Licensee and all Sub-Licensees in light of the reasonable length of the noncompetition period and non-solicitation period and the Licensor's present strategy and its future

needs to market its services and sell its products in a large geographic area in order to have a sufficient customer base to make the Licensor's business profitable and in light of the limited restrictions on the Licensee as set forth herein.

      (d)    Any violation of any provision of this Article VIII will result in irreparable injury to Licensor.

      8.4    <u>Severability</u>.

      (a)    The covenants in this Non-compete and Non-solicitation Article VIII are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant.

      (b)    If any provision of this Article VIII relating to the time period, scope, or geographic area of the restrictive covenants shall be declared by a court of competent jurisdiction to exceed the maximum time period, scope, or geographic area, as applicable, that such court deems reasonable and enforceable, then this Agreement shall automatically be considered to have been amended and revised to reflect such determination.

      (c)    All of the covenants in this Article VIII shall be construed as an agreement independent of any other provisions in this Agreement, and the existence of any claim or cause of action Licensee or any Sub-Licensee may have against Licensor (other than a material breach of this Agreement by Licensor which has not been cured in accordance with the terms hereof) shall not constitute a defense to the enforcement by Licensor of such covenants.

      (d)    Licensee and all Sub-Licensees have carefully read and considered the provisions of this Article VIII and, having done so, agrees that the restrictive covenants in this Article VIII impose a fair and reasonable restraint on it and are reasonably required to protect the interests of Licensor and its officers, directors, employees, and stockholders.

ARTICLE IX
WORK PRODUCT

      9.1    <u>Ownership of Work Product</u>.  All work product, property, data, documentation, information or materials conceived, discovered, developed or created by Licensee during the Term and which relates to the Licensed Patent, the Licensed Products, the Licensed Use, the Licensed Method, or the Injectable Technology (collectively, the "Work Product") shall be owned exclusively by the Licensor. To the greatest extent possible, any Work Product shall be deemed to be a "work made for hire" (as defined in the United States Copyright Act, 17 U.S.C. § 101 et seq., as amended) and owned exclusively by Licensor. Licensee and all Sub-Licensees hereby unconditionally and irrevocably transfer and assign to Licensor all right, title and interest in or to any Work Product. Moreover, Licensee and all Sub-Licensees agree that any trade secret, invention, improvement, patent applications, copyrighted material, program, system or novel technique or the like conceived, devised, developed or otherwise obtained by Licensee during the Term shall be and become the sole property of Licensor, and that Licensee and all Sub-Licensees shall execute any and all documents reasonably necessary to evidence or secure Licensor's ownership of the Work Product.

ARTICLE X
REPRESENTATIONS, WARRANTIES, AND DISCLAIMERS

10.1    Mutual Representations and Warranties. Each Party, including all Sub-Licensees, represents and warrants to the other Party that, as of the Effective Date:

(a)    such Party, if an entity, is duly organized and validly existing under the Laws of the jurisdiction of its incorporation or organization;

(b)    such Party has taken all action necessary to authorize the execution and delivery of this Agreement and the performance of its obligations under this Agreement;

(c)    this Agreement is a legal and valid obligation of such Party, binding upon such Party and enforceable against such Party in accordance with the terms of this Agreement, except as enforcement may be limited by applicable bankruptcy, fraudulent conveyance, insolvency, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and by general equitable principles; and

(d)    such Party has all right, power and authority to enter into this Agreement, to perform its obligations under this Agreement.

10.2    Licensee's Representations and Warranties. Licensee represents and warrants to Licensor that, as of the Effective Date and at all times this Agreement is in effect:

(a)    Licensee and all Sub-Licensees are duly licensed to practice medicine in the state in which Licensee's Territory is defined;

(b)    Licensee's and all Sub-Licensees' license to practice medicine has not been suspended, restricted or revoked in any state;

(c)    Licensee and all Sub-Licensees' will maintain at all times all necessary narcotics and controlled substances licenses as may be required for performance hereunder;

(d)    Licensee and all Sub-Licensees are qualified and currently competent as a physician to provide medical services to patients;

(e)    Licensee and all Sub-Licensees have not been excluded from participation in any government-funded healthcare program and is not subject to any pending or threatened governmental investigations that may lead to or result in such exclusion;

(f)    Licensee and all Sub-Licensees will provide medical care and services and render care to patients in accordance and in the manner consistent with the highest medical standards;

(g)    Licensee and all Sub-Licensees will conduct him/herself in a manner consistent with the principles of medical ethics of the American Medical Association or the American Osteopathic Association, as applicable;

-14-

(h)     Licensee and all Sub-Licensees, except as disclosed in writing to Licensor, have never been reprimanded, sanctioned or disciplined by any licensing board or state or local medical society or specialty board;

(i)     Licensee and all Sub-Licensees, except as disclosed in writing to Licensor, has never had his medical staff membership or clinical privileges at any hospital or other health care facility be involuntarily suspended, curtailed, or revoked based on factors relating to competence or professional conduct;

(j)     and all Sub-Licensees information provided to Licensor concerning his qualifications, credentials, educational background, professional experience and competence, and professional abilities is true and correct in all respects;

(k)     Licensee and all Sub-Licensees have no agreement, contract, or provision that restricts or limits him from performance hereunder; and

(l)     Licensee will comply with all federal and state laws and regulations regarding the Licensed Use of the Licensed Product, including regulations from all applicable state agencies and state medical licensure board(s).

(m)     Licensee and all Sub-Licensees will immediately notify Licensor of: (i) any change of business address; (ii) any action by any licensing body, certification board, professional review body, hospital, governmental agency, professional review organization, professional society or other organization revoking, suspending, denying, limiting, restricting or otherwise adversely affecting his ability to practice medicine or any clinical privileges, staff appointment or membership; (iii) a judgment against, or a payment in settlement made by or on behalf of, him in any action which involves the negligence, professional liability, professional misconduct, or other activities pertaining in any way to the practice of medicine; (iv) any notice, hearing or action of any professional review organization or professional review body concerning his competence or professional conduct or rendition of medical care; (v) adjudication as bankrupt; (vi) indictment, arrest or conviction for a felony or for any criminal charge related to the practice of medicine; (vii) any information that would materially change any of the representations that are set forth in this Agreement or in any credentialing information provided or submitted to Licensor; (viii) any filing with the National Practitioner Data Bank; and (ix) any sanction imposed by any government-funded healthcare program.

10.3     Marketing Representations.

(a)     Licensee represents and warrants that Licensee will be responsible for and obligated to perform ongoing marketing within Licensee's Territory at Licensee's sole expense on behalf of Licensee and all Sub-Licensees. Licensee agrees to provide to Licensor within ten (10) days upon written request all information regarding Licensee's marketing campaigns, expenses, and examples of marketing performed.

(b)     Licensee agrees to modify, adapt, cease, or otherwise change the content or other advertising placement specifications upon Licensor's request in the event that Licensor has reasonable basis to believe Licensee's marketing may misrepresent the male enhancement service offering and may not strictly adhere to all marketing policies and standards Licensor may specify.

(c)     Licensee recognizes and acknowledges that Licensor has acquired significant experience in marketing and that a sustained, ongoing marketing program is a necessary element for continued promotion and success in performing the Licensed Use of the Licensed Products on patients within Licensee's Territory. Licensee recognizes and acknowledges that Licensor recommends Licensee spend no less than the greater of $10,000 or 10% of gross revenue per month on marketing in Licensee's Territory.

10.4     Disclaimer of Representations and Warranties.  Other than the representations and warranties provided in Section 10.1 above:

LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, CONCERNING THE PATENT RIGHTS AND THE RIGHTS GRANTED HEREUNDER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, VALIDITY OF PATENT RIGHTS OR CLAIMS, WHETHER ISSUED OR PENDING, AND THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, AND HEREBY DISCLAIMS THE SAME. SPECIFICALLY, AND NOT TO LIMIT THE FOREGOING, LICENSOR MAKES NO WARRANTY OR REPRESENTATION (i) REGARDING THE VALIDITY OR SCOPE OF ANY OF THE CLAIM(S), WHETHER ISSUED OR PENDING, OF ANY OF THE PATENT RIGHTS, AND (ii) THAT THE EXPLOITATION OF THE PATENT RIGHTS OR ANY PRODUCT WILL NOT INFRINGE ANY PATENTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF LICENSOR OR OF ANY THIRD PARTY.

ARTICLE XI
INDEMNIFICATION, INSURANCE AND LIMITATION OF LIABILITY

11.1     Indemnification.  Licensee, on behalf of Licensee and all Sub-Licensees, shall indemnify, defend, and hold harmless Licensor and its directors, officers, employees and agents and their respective successors, heirs and assigns (the "Indemnitees"), against any liability, damage, loss, or expense (including reasonable attorney's fees and expenses of litigation) incurred by or imposed upon any of the Indemnitees in connection with any claims, suits, actions, demands or judgments arising out of any theory of liability (including without limitation actions in the form of tort, warranty, or strict liability and regardless of whether such action has any factual basis) concerning any product, process, or service that is made, used, or sold pursuant to any right or license granted under this Agreement; provided, however, that such indemnification shall not apply to any liability, damage, loss, or expense to the extent directly attributable to (i) the negligent activities or intentional misconduct of the Indemnitees or (ii) the settlement of a claim, suit, action, or demand by Indemnitees without the prior written approval of Licensor.

11.2     Procedures.  The Indemnitees agree to provide Licensee with prompt written notice of any claim, suit, action, demand, or judgment for which indemnification is sought under this Agreement. Licensee agrees, at its own expense, to provide attorneys reasonably acceptable to Licensor to defend against any such claim. The Indemnitees shall cooperate fully with Licensee in such defense and will permit Licensee to conduct and control such defense and the disposition of such claim, suit, or action (including all decisions relative to litigation, appeal, and settlement); provided, however, that any Indemnitee shall have the right to retain its own counsel, at the

expense of Licensee, if representation of such Indemnitee by the counsel retained by Licensee would be inappropriate because of actual or potential differences in the interests of such Indemnitee and any other party represented by such counsel. Licensee agrees to keep Licensor informed of the progress in the defense and disposition of such claim and to consult with Licensor with regard to any proposed settlement.

11.3    Insurance.

(a)    Not later than thirty (30) days before the Licensed Products are compounded for the Licensed Use by Licensee or Sub-Licensees, and at all times thereafter until the expiration of all applicable statutes of limitation pertaining to the administration of the Licensed Products to patients, Licensee will at Licensee's expense, obtain and maintain in full force and effect, comprehensive general liability insurance naming Licensor as an additional insured, and which shall be non-cancelable except upon thirty (30) days prior written notice to Licensor.

(b)    Licensee, on behalf Licensee and all Sub-Licensees, shall provide Licensor with written evidence of such insurance upon request of Licensor. Licensee shall provide Licensor with written notice at least thirty (30) days prior to cancellation, non-renewal or material change in such insurance

11.4    Limitation of Liability.    IN NO EVENT SHALL LICENSOR OR ITS AFFILIATES, OR ANY OF ITS/THEIR DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS BE LIABLE TO LICENSEE OR ANY OF ITS AFFILIATES, SUB-LICENSEES OR DISTRIBUTORS FOR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING IN ANY WAY OUT OF THIS AGREEMENT OR THE LICENSE OR RIGHTS GRANTED HEREUNDER, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, INCLUDING WITHOUT LIMITATION ECONOMIC DAMAGES OR INJURY TO PROPERTY OR LOST PROFITS, REGARDLESS OF WHETHER LICENSOR SHALL BE ADVISED, SHALL HAVE OTHER REASON TO KNOW, OR IN FACT SHALL KNOW OF THE POSSIBILITY OF THE FOREGOING.

ARTICLE XII
TERMINATION

12.1    Grounds for Termination.

(a)    Licensee may terminate this Agreement with or without cause with six (6) months written notice to Licensor.

(b)    Licensor shall have the right to terminate this Agreement upon a material breach of this Agreement by Licensee, including Licensee's or any Sub-Licensees' failure to strictly adhere to Licensor's quality control standards or Pricing Controls; provided, Licensor shall provide written notice to Licensee of the material breach and Licensee shall have sixty (60) days to fully cure said breach to Licensor's reasonable satisfaction.   Upon notice to Licensee of a material breach, Licensor shall have and retain the right to require Licensee and all Sub-Licensees to cease use of the Licensed Products until said breach is fully cured to Licensor's reasonable satisfaction.

12.2    Effects of Termination.    On the expiration or sooner termination of this Agreement:

(a)    The rights and license granted to Licensee and all Sub-Licensees herein shall forthwith terminate and automatically revert to Licensor.

(b)    Licensee and all Sub-Licensees shall: (i) cease production and use of the Licensed Products; (ii) pay all unpaid Royalties and other payments due to Licensor, indemnification amounts and other sums due hereunder (and such obligation shall survive termination of this Agreement); (iii) immediately deliver to Licensor a final Monthly Report; (iv) return to Licensor all remaining unused inventory of the Licensed Products at Licensee's cost; and (iv) within five (5) days, provide to Licensor a notarized affidavit of compliance with all elements of this paragraph.

(c)    Licensor shall refund to Licensee the amount Licensee paid for all unused Licensed Products returned within thirty (30) days of Licensor's receipt of such Licensed Products.

(d)    The termination or expiration of this Agreement shall not relieve Licensee and all Sub-Licensees of any obligation due to Licensor arising or accrued prior to or as of the date of such termination or expiration, including without limitation the obligation to pay Royalties and indemnification amounts and other payments due to Licensor, reporting obligations, and restrictions set forth herein.

12.3    Term and Auto Renewal.  The term of this Agreement shall be for one (1) year from the Effective Date and shall automatically renew for one-year periods thereafter unless Licensee provides six (6) months' notice to Licensor of Licensee's intent to terminate this Agreement.

## ARTICLE XIII
## LAB USE AGREEMENT

13.1    Licensee Use of Laboratory.  Licensee desires to cause a technician that is appropriately trained, skilled, qualified, and approved by Licensor in accordance with the Licensor's approval process to use the Licensor's sterile laboratory and equipment ("the Laboratory") for compounding of the Licensed Product ("the Technician"). Licensee and all Sub-Licensees shall be allowed access to the Laboratory upon notice to and scheduling by Licensor.

13.2    Licensee Use of Technician.

(a)    At Licensee's request, Licensor agrees to make available to the Technician the use of the Laboratory solely for compounding of the Licensed Product, which may be made via an affiliate or other approved designee of Licensor. The Laboratory may not be used by any other person or for any other purpose. All costs and expenses of the Technician shall be paid by the Licensee. Licensee shall be considered fully and completely responsible for supervision of the Technician at all applicable times during the compounding process pursuant to any and all state and/or federal regulations governing a physician's supervision of staff in performing compounding of medications.

(b)     Following each compounding process, the Technician shall provide to Licensee and Licensor a document of verification that the Licensed Products were produced pursuant to the Licensed Patent and Licensee's specifications.

(c)     Upon Licensee's receipt of the Licensed Products following compounding, Licensee shall inspect the Licensed Products and, within five (5) days of receipt, notify Licensor in writing of any damage or other recognizable adulteration to the Licensed Products such as broken vials, mislabeling, etc.

13.3     Compensation for Lab Use and Technician.  Licensee agrees to pay to the Licensor a monthly fee ("Lab Use Fee") for each Laboratory usage, whether or not the Laboratory is used for Licensee's compounding during each month. The Lab Use Fee is due on or before the 5th day of each month, and prior to any usage for the month. Licensee further agrees to pay to the Licensor (or an affiliate of Licensor as specified by Licensor) a fee ("Technician Fee") to compensate the Technician for the Technician's services for each month of the Technician's services, whether or not the Technician is used for Licensee's or any Sub-Licensees' compounding during each month.  Licensee agrees to pay to pay the Technician Fee monthly for Licensee and for each of all Sub-Licensees, in an amount equal to the Technician fee multiplied by the number of Sub-Licensees plus one.  The amount of the Lab Use Fee and the Technician Fee are initially as set forth in Policy.  The Licensor may change the amount of the Lab Use Fee or the Technician Fee on not less than ten (10) days prior written notice to Licensee.  Licensee understands and agrees the monthly Lab Use Fee and the Technician Fee will increase due to changes in costs or increased costs of the underlying expenses associated with Licensor's (or Licensor's affiliate's) provision of the Laboratory and the Technician.

13.4     Licensee Access to Laboratory.  Licensee and all Sub-Licensees shall be permitted to access and examine the Laboratory upon request to Licensor, with such access and inspection conditioned upon scheduling of a Licensor agent to accompany Licensee and all Sub-Licensees. Licensee and all Sub-Licensees shall additionally be provided a listing and description of the equipment and components utilized in the Laboratory upon request by Licensee to Licensor.

13.5     Delays.  The Licensor shall not be responsible for any delays or failure to make the Laboratory available or to provide access to the aforementioned Technician to the Laboratory due to acts of God, strikes or other disturbances or events beyond Licensor's control, and in all such cases the Lab Use Fee and Technician fee shall be due an payable to Licensor unless otherwise agreed in writing.

13.6     Risk.  The Licensee and all Sub-Licensees acknowledge that he/she is fully aware of the nature, risks, and possible consequences of using the compounded product for its intended use. The Licensee and all Sub-Licensees consent to accept liability for the performance of the intended uses of the Licensed Products with full knowledge and awareness of those risks.

13.7     Assumption of Risk.  The Licensee and all Sub-Licensees realize that the intended use involves dangers that cannot be foreseen, and that bodily injury, disfigurement, or death could result from the intended uses. The Licensee and all Sub-Licensee hereby agree that the Licensee has knowledge of and understands the scope and nature of the risks involved in the intended use and voluntarily and freely chooses to incur such risks.

13.8    Exemption from Liability.  The Licensee and all Sub-Licensees exempt and release Licensor and Licensor's business entities, affiliates, officers, directors, agents, servants, employees, bailors, and lessees from any and all actions or causes of action whatsoever arising out of any damages, loss or injury to the Licensee and all Sub-Licensees or to the Licensee's and all Sub-Licensees' patients allegedly caused by the Licensed Product or otherwise associated with the intended uses, whether such loss, damages, or injury results from the negligence of the Licensee or any Sub-Licensee or the Technician or Licensor or each of its/their business entities, affiliates, officers, directors, agents, servants, employees, bailors, and lessees, or from some other cause. In no event shall Licensor or Technician and its/their business entities, affiliates officers, directors, agents, servants, employees, bailors, and lessees be held liable for the negligent acts of the Licensee.

13.9    Practice of Medicine.  The Licensee and all Sub-Licensees acknowledge that the practice of medicine is an inexact science. The Licensee and all Sub-Licensees understand that, while the Technician is working under Licensee's or any Sub-Licensees' supervision to prepare and provide said formulations, no guarantee can be made that said formulations will be safe and/or effective for the intended use. Neither the Licensee or any Sub-Licensee has asked for nor received any guarantees or promises as to the results to be obtained.

13.10    Covenant Not to Sue.  The Licensee and all Sub-Licensees agree never to institute any suit or action at law or otherwise against Licensor or the Technician or its/their business entities, affiliates, officers, directors, agents, servants, employees, bailors, and lessees, and not to initiate or assist the prosecution of any claim for damages or cause of action which the Licensee or any Sub-Licensee, its/their patients, executors, or administrators hereafter may have by reason of injury to the Licensee, his/her property, or his/her patients arising from the activities contemplated by this Agreement.

13.11    Continuation of Obligations.  The Licensee and all Sub-Licensees agree and acknowledge that the terms and conditions of the foregoing provisions shall continue in full force and effect now and in the future at all times during which the Licensee participates, either directly or indirectly, in the activities contemplated by this Agreement and shall be binding upon the Licensee's heirs, executors, and administrators of his/her estate. The Licensee acknowledges that he/she has read all of the provisions above, fully understands the terms and conditions expressed there, and has freely chosen to accept the provisions of this Agreement, and expressly those relating to Risk, Assumption Of Risk, Exemption For Liability, Practice of Medicine, Covenant Not To Sue, and Continuation Of Obligations.

## ARTICLE XIV
## MISCELLANEOUS

14.1    Entire Agreement.  This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof. If any provision of this Agreement is in conflict with the terms and conditions specified in an Exhibit hereto or Policy, the terms of the Exhibit or Policy shall govern.

14.2    Modification of Agreement.  Licensor may modify this Agreement upon written notice to Licensee or by written notice of a change in Policy. If Licensee refuses to accept

Licensor's modifications, Licensee may operate under this Agreement for thirty (30 days from the Licensor's date of notice of modification, and shall provide written notice of such refusal within ten (10) days of receipt notice of such modification, in which case this Agreement will automatically terminate in thirty (30) days from Licensor's written notice of modification to Licensee; otherwise, Licensor's modifications to this Agreement shall become fully in force and effective at the time specified in any such notice or notice of Policy change or new Policy.

14.3    Modification by Policy. Licensee agrees that, due to the potential of market factors affecting Licensor and the male enhancement market, Licensor may choose to modify the the business arrangement contemplated by this Agreement and may do so by modifying this Agreement and/or Policies and/or addition or removal of Policies, with such modifications and amendments being effective on the date specified in each such Policy or in such Notice of modification to this Agreement. Licensee agrees to adhere to all such Policies and other modifications, and to accept such Policies as superseding amendments and modifications to this Agreement where applicable.

14.4    Consideration for Agreement Modifications. Licensee expressly agrees and acknowledges that Licensor's Modification of this Agreement by any method set forth herein, including Policy changes, shall be considered valid and binding modifications to this Agreement, with Licensor's good, sufficient and valuable consideration to Licensee being Licensee's continuing right to utilize the Licensed Use of the Licensed Product and perform hereunder.

14.5    Assignment. The rights of Licensee under this Agreement shall not be directly or indirectly assigned, sub licensed, or subcontracted, in whole or in part (whether by operation of law, in bankruptcy or otherwise) without the prior written consent of Licensor. Any assignment or attempted assignment pursuant to the change of control of Licensee or merger or the sale of the stock, assets or business of Licensee or sale of a product line or division that includes rights to any of the Licensed Products shall not be effective without the prior written consent of Licensor, which consent shall not be unreasonably withheld. Any assignment in violation of this Section shall be null and void.

14.6    Licensee Rights are Personal. The rights of Licensee under this Agreement are personal in nature to the Licensee and all Sub-Licensees. Licensee shall not allow any other person, by any means or arrangement, to have or otherwise enjoy these rights other than as provided in this Agreement for Licensee's use of Sub-Licensees.

14.7    Waiver. The failure of either Party to insist upon strict performance of any of the terms and conditions of this Agreement, or delay in exercising any of its remedies, shall not constitute a waiver of any terms or conditions or an acceptance of any default or a waiver of any remedy.

14.8    Relationship of Parties. Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, or agency relationship between the Parties hereto or shall be deemed to render Licensor liable for any of the debts or obligations of Licensee. Licensee and all Sub-Licensees shall in no way be considered an agent or representative of Licensor in any dealings Licensee may have with any third party or of the parties

hereto, nor shall any of their employees or agents have the power or authority to bind or obligate the other Party.

14.9     Severability. If any provision in this Agreement should be or become invalid or unenforceable for any reason whatsoever, the invalidity or unenforceability of such provision shall not affect the validity or enforceability of the remaining provisions and the Parties shall use their best efforts to replace such provision with a valid and enforceable provision.

14.10     Notices. All notices and other communications hereunder shall be in writing and shall be deemed given when delivered personally or one (1) business day after being delivered to a nationally recognized overnight courier with next day delivery specified to the addresses specified by each Party, or at such other address as either Party may supply by written notice delivered in accordance herewith, including electronic mail.

14.11     Patent Numbers. Licensee and all Sub-Licensees shall not remove or otherwise alter the packaging or labels on Licensed Products.

14.12     Governing Law, Venue and Jurisdiction. The Parties agree that jurisdiction and venue in any action brought by any party pursuant to this agreement shall properly and exclusively lie in any federal or state court located in Palm Beach County in the State of Florida. By execution and delivery of this agreement, each Party irrevocably submits to the exclusive jurisdiction of such courts for itself and in respect of its property with respect to such action. The Parties irrevocably agree that venue would be proper and exclusive in such court, and hereby waive any objection that such court is an improper or inconvenient forum for the resolution of such action.

14.13     Survival. In addition to any specific survival references in this Agreement, Articles IV, VI, VII, VIII, IX, and XI, and Sections 10.4, 13.7, 13.9, 13.10, 14.10, and 14.11 shall survive termination or expiration of this Agreement. Any other rights, responsibilities, obligations, covenants, and warranties which by their nature should survive this Agreement shall similarly survive and remain in effect.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date first written above.

*[The remainder of this page intentionally left blank.  Signature Page follows.]*

## SIGNATURE PAGE

**BY SIGNATURE BELOW, LICENSEE REPRESENTS AND WARRANTS THAT LICENSEE HAS READ THIS AGREEMENT IN FULL, HAS HAD AN OPPORTUNITY TO ASK AND HAVE ANSWERED ANY QUESTIONS REGARDING THIS AGREEMENT, HAS HAD OPPORTUNITY TO HAVE COUNSEL OF LICENSOR'S CHOICE REVIEW THIS AGREEMENT, AND HAS CONSCIOUSLY AND DELIBERATELY AGREED TO ENTER INTO THIS AGREEMENT UPON SIGNING BELOW.**

Loria Pharmaceutical, LLC (Licensor); and
Loria Management, LLC; and
Loria Products, LLC; and
Loria Compounding Consultants and Staffing Services, LLC

LICENSOR

Signature: _____

Print Name: _____

Title: _____

Date: _____

Addr:   10773 N.W. 58th St., Ste. 751, Doral, FL 33178

LICENSEE

Signature: _____

Print Name: Walter Kane MD / Mathew Sam MD

Title: Owner / Owner

Date: 4/22/21 / 4/22/21

Email: walter.kane@hotmail.com / matthewsam.erdoc@gmail.com

Addr: 254240 Kuykendahl Rd A-290 / & Same
The Woodlands TX 77375

-23-

## EXHIBIT A
### TERRITORY

*[Included as separate document]*

# LORIA PHARMACEUTICAL

*INDEPENDENT LICENSEE AND SERVICE*
*AGREEMENT*

*EXHIBIT 'A' LICENSEE TERRITORY*

**Loria Pharmaceutical LLC**
10773 NW 58th St Ste 751
Doral FL 33178

1-844 – Dr Loria
786-409-5911
Info@LoriaPharmaceutical.com

# EXHIBIT A
## LICENSEE TERRITORY

**Licensee:** _Walter Kare MD / Matthew San MD_

### ALL SPECIFICATIONS AND OTHER INFORMATION SET FORTH ON THIS
### EXHIBIT IS SUBJECT TO CHANGE PURSUANT TO THE AGREEMENT.

**Territory:**

- Harris County, Texas
- Montgomery County, Texas
- 
- 

Licensor
**LICENSEE**

Signature: _____

Print name: _____

Date: _____

Licensee
**LICENSOR**

Signature: _____

Print name: _Walter Kare MD / Matthew Sun_

Date: _4/02/21_    _4/22/2_

1